IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 1, 2020

## STATE OF TENNESSEE v. CARLOS DEWATHERDO FERGUSON, JR.

**Appeal from the Circuit Court for Hardin County**
**No. 16-CR-206    Creed McGinley, Judge**

---

### No. W2019-02199-CCA-R3-CD

---

The defendant, Carlos Dewatherdo Ferguson, Jr., appeals his Hardin County Circuit Court jury convictions of second degree murder and reckless endangerment committed with a deadly weapon, arguing that the evidence was insufficient to support his convictions; the trial court erred by denying his motion to dismiss; the trial court erred by failing to instruct the jury as to the State's duty to preserve evidence; and the trial court erred by imposing a mid-range sentence.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Chadwick G. Hunt, Savannah, Tennessee for the appellant, Carlos Dewatherdo Ferguson, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Matthew F. Stowe, District Attorney General; and Jennifer Hedge and Carthel L. Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Hardin County Grand Jury charged the defendant with one count of the first degree murder of Brelyn Cherry and three counts of the reckless endangerment of Lewis Higgins, Alexis Abel,[1] and Anthony Harris.[2]

---

[1]    The indictment identified Ms. Abel as "Alexis Knikki," but at the preliminary hearing, Ms. Abel stated that Knikki was her middle name.

[2]    The defendant was also charged with one count of possession of a firearm during the commission of first degree murder, which count the court dismissed before trial.

At the March 2019 trial, Doctor Erica Curry testified that Mr. Cherry's autopsy revealed that he "had a gunshot wound on his right temple" and on his right shoulder. Both entrance wounds had gunpowder stippling, which Doctor Curry explained indicated that he was shot from an intermediate range of "between six inches and three feet."

Karlee Lance testified that she worked at the Cedar Pantry convenience store in October 2016. As she was preparing to leave her shift on October 7, she saw "a gold car pull up in front of the store." She said that within only a few minutes, a girl began to exit the car when a "darkish bluish SUV" arrived, and the girl "jumped back into her vehicle." The driver of the SUV "pulled out a gun and started shooting" at the gold car. Ms. Lance said that the SUV had pulled up diagonally to the gold car, which was parked in a parking space. She recognized the SUV driver as the defendant, whom she had known as a customer at the store. She said that she saw the defendant holding a gun out of the SUV's window pointed toward the gold car, and she saw bullets hit the car. After the shooting, the car "backed up and took off," and Ms. Lance saw bullet holes in the side of the car, and a window that had been shot out. She said that the SUV drove forward "two or three times and then finally it went into reverse" and drove in the direction of Max's Barber Shop located across the street from the Cedar Pantry. Ms. Lance stated that she called 9-1-1 and reported the shooting. She described the occupants of the gold car as "two guys in the backseat and two females in the front seat." She recognized the driver of the gold car as "Alexis" but did not recognize the other occupants. She said that the occupant in the rear passenger side of the car appeared to have been shot.

During cross-examination, Ms. Lance stated that she remained at the scene and gave a statement to police. She acknowledged that she did not see the shooter's face at the time of the shooting and that she recognized the defendant as the shooter only after "the officers brought him back on the scene to put him in a vehicle." She said that she did not see the victims display any weapons and did not hear any gunshots come from the victims' vehicle.

On redirect examination, Ms. Lance stated that she recognized an occupant of the SUV as Joanna Sharp. She stated that the two women in the front seat of the victims' vehicle both had "blondish" hair.

Brandy Funderbunk, who also worked at the Cedar Pantry at the time of the shooting and was Ms. Lance's sister, testified that she was preparing to leave work when she saw a dark-colored SUV "whip[] in right beside" a car that was parked at the store, and someone "started firing gunshots." She ran back inside the store and "hollered to my sister [to] call the law." She said that the only person she recognized from either vehicle was

Ms. Sharp, who was an occupant in the SUV. She said that the victims arrived at the store first and parked in the "first parking spot." She recalled seeing "two girls in the front seat of the car and did not recall seeing anyone in the back seat. She said that she did not see any victim brandish a weapon or hear any gunshots from the victims' vehicle. She acknowledged that it was dark at the time and that she could not "really see." After running back into the store and telling her sister to call the police, she "ran back outside to get the tag number" from the SUV before it drove away. She said that the SUV was "trying to leave, but the car must have not been in reverse because he was going, he was like hitting" a pole in front of the vehicle. Finally, the SUV "backed out and took off across the street." Ms. Funderbunk identified the defendant as the driver of the SUV.

During cross-examination, Ms. Funderbunk testified that the victims' car had not been at the store "long at all," "[n]ot even a minute" before the shooting began. She said that she was outside the store "standing right at the front door" when she heard the gunshots and that Ms. Lance was "heading out the door" behind her but was still inside the store when the shooting started. She said that she saw the occupants of the SUV because "[t]he windows were down." She did not recognize the occupants of the victims' car.

Savannah Police Department Officer Robert Steward testified that he responded to the shooting at Cedar Pantry on October 7, 2016. When he arrived, both vehicles had already left. He collected five shell casings from the scene. During cross-examination, he stated that he took statements from two Cedar Pantry employees and the owner of a tattoo parlor located across the street. He acknowledged that a witness reported seeing two white women in the gold car but that only one woman was actually in the car.

Tennessee Highway Patrol Lieutenant Dwayne Stanford testified that he responded to the Cedar Pantry on October 7, 2016, to assist local law enforcement officers. He said that he parked his vehicle in an empty parking lot across the street from the Cedar Pantry, where he found a "Smith & Wesson shield handgun" in a "little alley way" "kind of in between two buildings." He stated that he secured the area and waited for a Savannah Police Department officer to arrive and collect the weapon.

Jeremy Lewis owned a tattoo shop located across the street from the Cedar Pantry. At the time of the shooting, he was crossing the street on foot to purchase cigarettes from the Cedar Pantry. He said that as he crossed the street, he saw a gold car arrive at the store. A woman began to exit the vehicle but "got back down in the vehicle" when a "dark colored" SUV pulled up and someone "stuck a black pistol out the window and fired one shot and then directly behind it four more." Mr. Lewis said that the man shooting from the SUV was "a black man with dreads." After the shooting, the SUV "went to back up and then forward, back up a few times, pulled forward like he was panicking." Just as the SUV left the scene, "the other car squealed out and went down . . . toward the high school."

During cross-examination, Mr. Lewis acknowledged that he reported to police that two white women with "[b]rownish-blonde" hair were in the front seat of the gold car. He said that he heard "some argument" from both vehicles, but he did not know the substance of the argument or whether the occupants of the vehicles were arguing "to each other or just in general." He stated that he did not see anyone in the gold car with a gun and that because he was standing behind both vehicles, he "could see all four doors of both vehicles."

Tennessee Bureau of Investigation ("TBI") Special Agent Cervinia Braswell testified that she processed a nine-millimeter Smith & Wesson pistol. She determined that the five shell casings collected from the scene "had been fired from that nine-millimeter pistol." During cross-examination, she stated that she also processed a "Taurus 380 auto pistol," which she described as a semiautomatic pistol with an obscured serial number that had been collected from the "rear floorboard" of a Nissan vehicle. She stated that the magazine for the Taurus pistol had a six-cartridge capacity but contained only three cartridges.

Retired TBI Special Agent James Russel Davis, II testified that the defendant tested negative for gunshot residue on his hands and clothing. He stated that a person standing within three to six feet of a fired gun could have traces of gunshot residue on them. He also said that it was possible for a person to be near a fired gun and test negative for gunshot residue because of natural dissipation or from washing one's hands. He said that a person's clothing could be protected from residue by a barrier between the gun and the shooter's body.

During cross-examination, Mr. Davis acknowledged that a negative test for gunshot residue could result from a person's washing their hands, the passage of time, "or other routine activities." He explained that even when a shooter does not wash his hands after firing the weapon, it was usual to find no traces of gunshot residue after six to eight hours.

Larry Wilbanks, an officer with the McNairy County Sheriff's Office, testified that in October 2016, he lived at the Savannah Village Apartments. On the evening of October 7, 2016, he was at the centrally-located mailboxes when he heard four to five gunshots. He drove his vehicle to his apartment building and "noticed a dark-color SUV" pull into the parking space immediately next to him and "a black male subject," later identified as the defendant, "jump out of" the SUV from the passenger's side. He said that the defendant, who was "wearing a red shirt and some dark-colored bottoms," "quickly removed himself from the vehicle and started walking in front of the vehicle, and the white female that was driving at that time said, 'Go, go, go.'" The man then walked between two

-4-

apartment buildings and "quickly turned around and walked back out." Officer Wilbanks "called central dispatch" and learned that there had been a shooting. Officer Wilbanks watched the defendant until police officers arrived.

Austin King, a patrol officer with the Savannah Police Department, responded to the Cedar Pantry. Because both vehicles had already left the scene, he went to the Savannah Village Apartments upon a report that "a black male wearing a red t-shirt had left one of the vehicles and was heading towards the Stout Street exit of the apartment complex." He saw a man matching that description and ordered him to stop, at which point the man, later identified as the defendant, "dropped face down on the asphalt and threw his hands behind his back." When he told the defendant that he was under arrest because he matched the description of a suspect in a nearby shooting, the defendant said that he did not know "anything about it."

During cross-examination, Officer King acknowledged that he had responded to a shooting on September 26, 2016, that had involved some of the victims from this case.

Sergeant Timmy Keen of the Savannah Police Department testified that on October 7 at approximately 6:00 p.m., he had stopped at the Tiger Mart convenience store on his way home from work where he saw the defendant inside the store and Ms. Sharp in an SUV parked outside. He stated that the defendant was wearing a red shirt at the time, and he recognized the shirt as the same one collected in this case. He also identified the SUV used in the shooting at the Cedar Pantry as the same one that he saw Ms. Sharp driving at the Tiger Mart.

Sergeant Keen stated that investigators collected a 22-caliber rifle and clip with 23 rounds from the woods at the Aspen Street Apartments. They also collected four rounds and "two 357 Magnum pistols" from those same woods. In a parking lot across the street from the Cedar Pantry, officers collected a "Smith & Wesson nine-millimeter" gun, and from the Cedar Pantry, they collected five spent casings. From the victims' car, officers collected "live rounds" and "a clip to a 380 pistol."

On October 11, four days after the shooting, officers collected a "Taurus 380 pistol" from the victims' car. Sergeant Keen said that officers inventoried the car on October 7, and the Taurus 380 was not found in the vehicle at that time. From October 7 through 11, the vehicle was in police custody and "covered with a tarp-type deal and a couple of days later, one of the officers just happened to walk by and looked in the car and [the gun] was laying in the floorboard." He stated that the car was in the police impound lot, but that the lot had no fencing or security cameras at the time.

-5-

Other items of evidence collected in this case included Mr. Cherry's and Mr. Higgins' clothing, all of which had bloodstains. Officers also collected marijuana from the victims' car and a "little bag" of "some type of powder" that was in a "little black . . . key box" in Mr. Cherry's possession.

During cross-examination, Sergeant Keen testified that he was "charged with checking . . . in" the victims' vehicle at the police department but that he was not in charge of securing the impound lot. He photographed the victims' vehicle on October 10. He had no explanation for why the gun was in the vehicle on October 11 but stated that it was not in the car when he, Captain Barker, and Officer Alex Davis inventoried it. Sergeant Keen stated that they thoroughly checked the vehicle. He clarified that only the broken window of the car was covered with a tarp while it was parked at the impound lot.

Sergeant Keen stated that he did not know who the defendant was prior to speaking with Ms. Sharp at the Tiger Mart. He stated that the marijuana found inside the victims' vehicle was not logged as evidence in this case because the victims were charged with possession offenses in an unrelated case. He said that the powder substance collected from Mr. Cherry was not sent to the laboratory because "it was his personal property. You can't charge a dead man." He acknowledged that officers also found a "rock-like" substance with a razor blade in the vehicle, and from the trunk of the vehicle, officers recovered a hunting knife.

Savannah Police Department Sergeant Wesley Murphy responded first to the Savannah Village Apartments, where the defendant was arrested, and then he went to the Aspen Apartments, where other officers were already on the scene with the victims. Mr. Cherry was being loaded into an ambulance. He learned that weapons had been thrown over a fence, and he located two firearms in the area, including "a rifle that was wrapped in the blanket . . . maybe a small assault rifle or a 22-caliber or something like that." He stated that the victims' car was secured at the scene.

During cross-examination, Sergeant Murphy stated that he found the rifle and a pistol at the same time, and clarified that a bystander reported that someone had gotten out of the victims' vehicle, thrown items over the fence, and returned to the vehicle before officers arrived.

Lindsey Murrell testified that in October 2016, she owned a dark blue Jeep Grand Cherokee. She was a long-time friend of Ms. Sharp, and on October 7, 2016, Ms. Sharp was living with Ms. Murrell for a period because Ms. Sharp "and her kids had nowhere to go and me being her friend, I let her come stay with me." The defendant visited Ms. Murrell's home a couple of times while Ms. Sharp lived there. On October 7, Ms. Murrell went out of town and left her vehicle for Ms. Sharp to use "for emergency

purposes." Ms. Murrell stated that she did not know that Ms. Sharp would use the vehicle to drive the defendant around. When Ms. Murrell returned home, she discovered that her vehicle had been impounded. She stated that after recovering the vehicle from the police, she did not find any broken glass, bullet holes, or other damage to it.

Alexis Abel testified that in October 2016, she was dating Anthony "Chuckie" Harris. At that time, she drove a 2001 gold Nissan Maxima. She said that she was a friend of the defendant's and had known him for four to six months at the time of the shooting. On October 7, 2016, Ms. Abel intended to go to Selmer for a barbecue. Also going with her were Messrs. Harris, Higgins, and Cherry. Ms. Abel drove, Mr. Harris rode in the front passenger seat, Mr. Cherry was in the backseat on the passenger's side, and Mr. Higgins was in the backseat on the driver's side. Before leaving town, the four friends stopped at a gas station to buy Gatorade, but the store was out of the kind that they wanted, so they went to the Cedar Pantry, where Ms. Abel was meeting her brother before she left town.

Ms. Abel stated that they were parked at the Cedar Pantry for "[m]aybe a minute" before "a blue Jeep Cherokee" pulled up sideways to her vehicle and she heard gunshots. She stated that she heard four shots and "tried to get in the floorboard," afraid that she "was going to die." She said that none of the victims said or did anything to provoke the gunshots. She stated that one of the windows on her vehicle was shot out and that she heard screaming coming from the Jeep that sounded "like a frightened -- like a scared scream" of a child and a woman. When she backed her car out to leave, she saw "a black male with dreads and a white t-shirt" in the Jeep.

As Ms. Abel drove away from the scene, Mr. Harris called 9-1-1, and the dispatcher instructed Ms. Abel to pull over and wait for help. Ms. Abel stopped at the Aspen Apartments, where she immediately "got out and went straight to the road" to speak with Officer Alex Davis. She said that Mr. Cherry had been shot and that his injuries "looked like a movie, but it was real."

During cross-examination, Ms. Abel acknowledged that she had marijuana and scales in her car but said that she was unaware of any other drugs in the vehicle. She stated that she used the scales to weigh what she purchased because "I didn't want to be ripped off." After the shooting, Ms. Abel told police that "the weed in the car was in the glovebox, and it was mine." Ms. Abel stated that she was unaware of any guns in her vehicle. Although she knew that Mr. Cherry had a duffle bag of clothing in the trunk of her car, she said that she did not know that the bag also contained marijuana and a gun.

Ms. Abel stated that she did not recognize the defendant at the time of the shooting. She reiterated that none of the victims were holding a gun when the Jeep drove

up, and she speculated that the weapons were in the trunk of the car because "[t]hey weren't in the car with me." Ms. Abel stated that, at the time of the shooting, she had been dating Mr. Harris for four months, and prior to that, she had been in a relationship with Darvoun Watson. After she began dating Mr. Harris, she received a threatening text message from Mr. Watson that said "that he was going to kick my door in." She said that she was unaware of the other victim's having threatened the defendant.

On redirect examination, Ms. Abel stated that she drove away from the Cedar Pantry after the shooting to "[g]et Brelyn to a hospital." On recross-examination, she explained that she stopped at Aspen Apartments only because the 9-1-1 operator had told her to pull over. She acknowledged that there had been a shooting outside her house two weeks prior to this shooting and that investigators had determined that shots had been fired from inside her vehicle, but she denied being in the vehicle during that shooting and stated that she had "no idea" about the incident.

Savannah Police Department Patrol Officer Justin Barker testified that when he arrived at Aspen Apartments, Mr. Cherry was being loaded into an ambulance. He secured the scene and then went to the Tiger Mart to retrieve security video footage from earlier in the day. On cross-examination, Officer Barker stated that officers had found two weapons at Aspen Apartments before he arrived, which weapons he understood had come from the victims' vehicle.

Alex Davis, an investigator with the Savannah Police Department responded to Aspen Apartments, and when he arrived, "I had several individuals come up to me yelling, screaming about an individual had been shot. I put on gloves, went to the individual, tried to help him and radioed back into EMS to get there." Later that night, he "went back to Aspen, and I believe found a revolver in the woods." He also responded to a parking lot of a barber shop across the street from the Cedar Pantry where he secured "a pistol and magazine."

During cross-examination, Officer Davis stated that Mr. Cherry was "in the back passenger side" of the vehicle "slumped over." He said that when he first arrived, he had no knowledge of weapons at the Aspen Apartments scene. He stated that the gun that he found later that night was a silver revolver wrapped in "this jacket looking thing" in the woods.

Joanna Sharp testified that she was in a relationship with the defendant at the time of the shooting. On October 7, she picked him up, and they went to Tiger Mart. They then went to Ms. Sharp's house, where she showered. When she got out of the shower, the defendant "was upset about a text message he had seen on my phone between me and Darvoun Watson." She and the defendant argued, and "he was ready to leave." The

-8-

defendant packed his clothes, and Ms. Sharp tried to talk to him, but he remained upset with her.  She agreed to drive the defendant to town, and she took her six-year-old daughter with her.  She recalled that, before they left her house, the defendant said "that he wanted to leave because he didn't want to go to jail."

Ms. Sharp said that during the drive, she and the defendant continued to argue, and the defendant became so "upset to where he hit me in my face.  I couldn't see to drive so I pulled over to let him drive."  She also explained that she "just felt like not driving was probably the best thing" because she did not "know how he was going to react I mean from there" and because she wanted "to get in the back seat with my child because she was freaking out already."  Ms. Sharp said that her daughter was crying and telling them "not to argue."  Ms. Sharp's daughter also asked the defendant to drop them off, but the defendant "told her, no, that he wasn't going to drop us off, that he wasn't playing."  She recalled that the defendant had said, "'[W]atch and see what's going to happen.'"

After Ms. Sharp got into the backseat with her daughter, the defendant drove to town, where Ms. Sharp noticed the victims' vehicle at the Cedar Pantry.  The defendant pulled up to the victims' car and "the window was already kind of down but he pulled the gun out and he told them I told ya'll about playing with me and just shot in the car."  During the shooting, Ms. Sharp "was trying to get out the back door" of the vehicle, but she was not able to open the door.  Her daughter was "crying, screaming" at that point, and Ms. Sharp repeatedly told the defendant to let her out of the vehicle, but he did not do so.  The defendant then drove "across the street" where he threw "something" out of the car near a barber shop.  He then drove to the Savannah Village Apartments where "[h]e got out the car, and I got in the driver's seat" and "drove straight to my aunt's house," where she sat for "probably 30 minutes . . . just trying to get my head together" before calling the police.

During cross-examination, Ms. Sharp testified that she knew that the defendant had been threatened by Mr. Higgins and Mr. Harris prior to the shooting, stating that they were "[b]asically just threatening his life."  She said that Mr. Harris had threatened the defendant "at least a few days or a week or so prior to the shooting."  She overheard the threat because "[t]hey called my phone" and the defendant spoke to them by speakerphone.  She described the nature of the threats as "basically telling [the defendant] that if he didn't give up his best friend [Mr. Watson], that they were going to kill him, too."  Ms. Sharp said that she provided this information to Captain Barker and had given him copies of text messages and Facebook postings related to the threats, but she acknowledged that she did not reveal this information in the statement that she gave the night of the shooting.

Ms. Sharp said that the defendant did not seem out of sorts when she first picked him up on October 7, and, even after the defendant became angry about a text

-9-

message on Ms. Sharp's telephone, he was no angrier than she had seen him in the past. She stated that she knew that "he was worried about" the threats. She said that she was in fear for her life because she knew that the victims knew where she lived and worried that they would come to her home.

Ms. Sharp said that she did not notice any of the victims with a weapon but acknowledged that she "wasn't even paying attention. I was just trying to figure out my next move to try to get out the car." She acknowledged that she knew that Mr. Harris and Mr. Higgins were "supposed to be Vice Lord" gang members and that she had previously seen them "throw up a gang sign." She stated that she knew that Mr. Harris and Mr. Higgins had previously "been shooting at" the defendant but that she did not know the details of that event. Ms. Sharp stated that she believed the defendant's actions on the night of October 7 to be out of self-protection based on the victims' prior threats to him.

On redirect examination, Ms. Sharp stated that during the shooting, she feared being hit by return gunfire because she knew that the victims "carried guns on them all the time." She acknowledged that neither she nor the defendant had reported the prior threats on the defendant's life to law enforcement.

Savannah Police Department Captain T.J. Barker, who was a sergeant at the time of the offenses, investigated the shooting at the Cedar Pantry, which occurred at 7:44 p.m. That night, he remained at the police station and "coordinated everything with the officers and the investigators." He also took statements from the victims and witnesses. He said that he interviewed Ms. Sharp twice—once on October 7 and again on October 17. He said that Ms. Sharp came to him "way after that" and provided him with "some text messages" and told him that the defendant had been threatened. It was his understanding that Ms. Sharp had no first-hand knowledge of the threatening messages or conversations.

In the early morning of October 8, Captain Barker met with the defendant and swabbed his hands for gunshot residue and collected his clothing. Captain Barker and Investigator Keen inventoried and photographed the victims' car.

During cross-examination, Captain Barker stated that all the witnesses consistently stated that the defendant was the only person with a gun during the shooting. He said that he believed that only two guns were in the victims' car on October 7—the two recovered from Aspen Apartments. He acknowledged that Mr. Higgins told him that the victims had two pistols in their car, but he reiterated that the only guns recovered that night associated with the victims were a rifle and a pistol. He said that one of the victims told him that they had removed the guns from the vehicle and had hidden them in the woods.

Captain Barker acknowledged that another pistol was found in the victims'

-10-

vehicle on October 11 but asserted that that gun was not in the vehicle when he inventoried it. He stated that although the vehicle was kept on police property, the area was not secured with a fence and was "not manned 24/7. So, anybody could have access to that vehicle." He said that it was possible for someone to put the gun in the car through the broken window despite that window's being covered. He said that the gun was found "in the middle of the rear floorboard behind the driver's side" and that it was in plain view "[s]o, that's something you're not going to miss when you're inventorying a vehicle." He insisted that the only explanation for the presence of the gun on October 11 was that "[s]omebody had to place it inside the car."

Captain Barker stated that officers recovered marijuana and scales from the victims' vehicle and said that scales are commonly used "for weighing -- the measurement of the product that they're going to buy" or sell. He said that the substance found in Mr. Cherry's bag appeared to be methamphetamine.

Captain Barker reiterated that all the witnesses reported hearing only five gunshots and seeing no weapons displayed by the victims. He said that all five shell casings found at the Cedar Pantry were from a nine-millimeter gun. He also said that he did not believe that the defendant acted in self-defense at the time of the shooting because he approached the victims even though he had an opportunity to go "the other way."

The State rested and the defendant presented witnesses.

Lewis Higgins testified that he was in the vehicle with Mr. Harris, Mr. Cherry, and Ms. Abel during the shooting at Cedar Pantry and acknowledged that Mr. Cherry had guns with him, including an "AR-22, and 380, and a 357." Mr. Higgins was interested in purchasing one of the weapons from Mr. Cherry. He explained that the men carried weapons "[b]ecause the stuff we was doing at the time," including "shooting, I guess you could say." He acknowledged that he, Mr. Harris, and Mr. Cherry had all previously threatened and shot at the defendant on more than one occasion including only two days prior to October 7. Mr. Higgins also acknowledged that he had posted a message on Facebook on September 29, 2016, that said, "Talk s*** to me then my shoota(s) appear #SniperGang." Another message that he posted on October 5 or 6 stated, "[I]t's killed or be killed." He explained that he posted the messages on his Facebook page and did not send them to anyone but that he intended for the defendant and Mr. Watson to see them. He said that he knew of other threats directed at the defendant but said, "[I]t wasn't really a lot of threats though," only a "couple of them," the substance of which was "[b]asically, we going to kill you."

Mr. Higgins said that the men's animosity toward the defendant was because of Mr. Watson. He explained that Ms. Abel began a relationship with Mr. Harris after she

-11-

and Mr. Watson broke up. Mr. Higgins acknowledged that he and the other victims had smoked marijuana on the day of the shooting but said that he was unaware of any other drugs in the vehicle. He stated that he did not see the shooter at Cedar Pantry and that none of the victims brandished a weapon at the time. He acknowledged that he, Mr. Harris, and Mr. Cherry were associated with the Vice Lords.

On cross-examination, Mr. Higgins said that he did not notice the defendant's vehicle until "the shots went off" but that he had "hear[d] some yelling" before the gunshots began. He realized that Mr. Cherry had been shot when the victims began to drive away and he saw that Mr. Cherry was slumped over toward him. He acknowledged that when they arrived at Aspen Apartments, he and Mr. Harris removed the guns from the vehicle—he took the 357 pistol and "wrapped it in my coat and threw it in the woods, and Mr. Harris took the AR-22 out of the trunk and also threw it into the woods." He said that he knew that there had been a 380 pistol in the car but that he did not remove that one "because everything happened so fast. I got the one I could find."

On redirect examination, Mr. Higgins explained that he and Mr. Harris hid the guns because they had "bought the[m] off the street" and that they were "[p]robably stolen."

Allison Todd testified that she knew the defendant through her friendship with Ms. Sharp. She said that she had witnessed Mr. Harris and Mr. Higgins threaten the defendant sometime in July 2016. She said that she was in a neighboring apartment to the men when she saw them shoot three shots "out the window while [the defendant] was running across out . . . towards the other houses." She said that she was aware of a second incident in which Mr. Harris shot at the defendant approximately two weeks after the first shooting. Ms. Todd said that the defendant was scared as a result of the shootings because "he had to watch his back every time he turned around because he didn't know what was going to happen."

During cross-examination, Ms. Todd acknowledged that she did not witness the incident in which Mr. Harris shot at the defendant. She said that law enforcement officers responded to the first shooting that she had witnessed and that Ms. Abel's car sustained damage during that shooting. Ms. Todd stated that she knew the victims carried firearms, stating that "pretty much" everyone in Savannah went armed.

Darvoun Watson testified that prior to the shooting, he knew of Mr. Higgins and Mr. Harris but did not know Mr. Cherry. He said that he had dated Ms. Abel for six to seven months and that he knew Mr. Harris "and them from the stuff that we was going through out there from them trying to shoot at us and stuff." Mr. Watson was not present during the Cedar Pantry shooting. Mr. Watson stated that Ms. Abel broke up with him and

-12-

began dating Mr. Harris. He said that one or two months prior to the October 7 shooting, Mr. Harris threatened him via text message and Facebook postings and Messrs. Harris, Higgins, and Cherry shot at him and the defendant from Ms. Abel's gold Maxima. He said that the substance of the threats was "that they was going to kill us wherever they saw us at."

During cross-examination, Mr. Watson stated that he had no affiliation with the Vice Lords. He acknowledged that he did not report the prior shooting incidents to the police, explaining that he had an outstanding warrant for his arrest. He estimated that the prior shooting occurred two weeks before the Cedar Pantry shooting. He said that he and the defendant were "scared" and were "trying to stay alive."

Based upon this evidence, the jury convicted the defendant of the lesser-included offense of second degree murder and three counts of reckless endangerment committed with a deadly weapon. After a sentencing hearing, the trial court imposed an effective 20-year sentence.

Following a timely but unsuccessful motion for a new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant argues that the trial court erred by denying his motion to dismiss, denying his request for a jury instruction on the State's duty to preserve evidence, and imposing a mid-range sentence and that the evidence was insufficient to support his convictions.

*I. Sufficiency of the Evidence*

The defendant contends that the State failed to present sufficient evidence to support his convictions because certain jurors made post-trial statements to the media, stating that they believed that the defendant had acted in a state of agitation or passion. The defendant argues that these statements by the jurors demonstrate that the defendant should have been convicted of the lesser charge of voluntary manslaughter. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (superseded on other grounds); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-

weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As relevant to this case, "[s]econd degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210(a)(1). Furthermore, "[a] person commits an offense who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." *Id.* § 39-13-103(a). "[F]or the threat of death or serious bodily injury to be 'imminent,' the person must be placed in a reasonable probability of danger as opposed to a mere possibility of danger." *State v. Payne*, 7 S.W.3d 25, 28 (Tenn. 1999). "Reckless endangerment committed with a deadly weapon is a Class E felony." T.C.A. § 39-13-103(b)(2).

Here, the evidence, considered in the light most favorable to the State, established that the defendant spotted the victims' vehicle parked at the Cedar Pantry and drove up next to the vehicle and fired five shots, hitting Mr. Cherry twice and killing him. This evidence is sufficient to support his conviction of second degree murder. The jury was charged as to the lesser included offenses, including voluntary manslaughter, and was free to reject the argument that any state of passion in which the defendant may have acted would have supported a conviction of voluntary manslaughter. *See id.* § 39-13-211(a) (defining voluntary manslaughter as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner").

Moreover, the evidence adduced at trial showed that Ms. Abel, Mr. Harris, and Mr. Higgins were all occupants of the vehicle when the defendant opened fire. The victims were most certainly placed in "imminent danger of death or serious bodily injury" by the defendant's firing five rounds into the occupied vehicle. *See* T.C.A. § 39-13-103(a); *see also State v. Bryan Williams*, No. W2009-00306-CCA-R3-CD, slip op. at 3-4 (Tenn. Crim. App., Jackson, Feb. 3, 2010) (finding evidence sufficient to support a conviction of the reckless endangerment of three passengers of a vehicle when the defendant opened the car door and fired three shots into the vehicle).

## II. *Motion to Dismiss*

In a pretrial motion, the defendant sought to have his charges dismissed, alleging first that the State failed to provide him with exculpatory evidence when it failed to provide him with evidence of certain threats made toward him by the victims. He also

sought dismissal on the ground that the State failed to preserve evidence because it did not recover a firearm from the victims' vehicle until four days after the shooting and because it failed to test certain substances found in Mr. Cherry's possession. The trial court denied the motion, finding that the State had made good faith efforts to provide the defendant with all discovery materials and ordering the parties to meet to review the State's file to ensure that the defendant had all of the materials.

### A. Brady Violation

The constitutional right to a fair trial imposes upon the State "duties consistent with the[] sovereign obligation to ensure 'that justice shall be done' in all criminal prosecutions." *Cone v. Bell*, 556 U.S. 449, 451 (2009) (quoting *United States v. Agurs*, 427 U.S. 97, 111 (1976) (citation and internal quotation marks omitted)). In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.*, 373 U.S. at 87. "Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the [S]tate's witnesses." *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001) (citing *State v. Walker*, 910 S.W.2d 381, 389 (Tenn. 1995); *State v. Copeland*, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998); *United States v. Bagley*, 473 U.S. 667, 676 (1985)). The duty to disclose exculpatory evidence extends to all "favorable information" irrespective of whether the evidence is admissible at trial. *State v. Robinson*, 146 S.W.3d 469, 512 (Tenn. 2004) (appendix); *Johnson*, 38 S.W.3d at 56. *Brady* and its progeny create in the "individual prosecutor . . . a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

To prove a *Brady* violation, a defendant must demonstrate:

1) that he requested the information (unless the evidence is obviously exculpatory, in which case the [S]tate is bound to release the information whether requested or not);

2) that the State suppressed the information;

3) that the information was favorable to the accused; and

4) that the information was material.

*Johnson*, 38 S.W.3d at 56 (citing *State v. Edgin*, 902 S.W.2d 387, 390 (Tenn.

1995); *Walker*, 910 S.W.2d at 389); *see also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) ("There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."). The evidence is deemed material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678). Plainly stated, establishing materiality requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435; *see Johnson*, 38 S.W.3d at 58.

Here, the defendant asserts that the State violated its duty under *Brady* because the discovery materials provided to him by the State did not include any of the evidence that Ms. Sharp said she had provided to Captain Barker. Specifically, Ms. Sharp testified at the preliminary hearing that she told Captain Barker that Mr. Harris had threatened the defendant's life, and the defendant argued at the hearing on his motion to dismiss that his discovery materials lacked any report from Captain Barker noting Ms. Sharp's having told him about the threats against the defendant.

Contrary to the defendant's assertion, this information is not implicated by *Brady*. First, at the hearing on the motion to dismiss, the defendant was in possession of the information that he claims the State failed to provide him. Indeed, he exhibited to that hearing the transcript of the preliminary hearing and copies of the very text messages and Facebook postings that he alleged the State failed to provide him. Furthermore, Ms. Sharp and Captain Barker testified at the motion hearing about the alleged threats to the defendant's life. The State's duty under *Brady* "does not extend to information that the defense already possesses, or is able to obtain." *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992).

Second, the jury heard testimony that the victims had threatened the defendant's life and had shot at him in the days leading up to the shooting, and they viewed images of certain threatening messages. Because at trial the defendant was able to present all of the evidence to support his argument of self-defense, he has failed to establish that had the State provided him with this information earlier "the favorable evidence could

-16-

reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

Consequently, because the State did not withhold material evidence, this issue lacks merit.

### B. Ferguson Violation

In *State v. Ferguson*, our supreme court "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *State v. Merriman*, 410 S.W.3d 779, 784 (Tenn. 2013) (citing *State v. Ferguson*, 2 S.W.3d 912, 915-16 (Tenn. 1999)). Our supreme court has observed that "the due process required under the Tennessee Constitution was broader than the due process required under the United States Constitution" and rejected the "bad faith" analysis espoused by the United States Supreme Court, *Merriman*, 410 S.W.3d at 784-85 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (holding "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law")), in favor of "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial," *Merriman*, 410 S.W.3d at 785. The supreme court also "observed that fundamental fairness, as an element of due process, requires a review of the entire record to evaluate the effect of the State's failure to preserve evidence." *Id.* at 784-85 (citing *Ferguson*, 2 S.W.3d at 914, 917).

To facilitate this "balancing approach," our supreme court ruled that the trial court must first "determine whether the State had a duty to preserve the evidence," *Merriman*, 410 S.W.3d at 785, and observed that the State's duty to preserve was "limited to constitutionally material evidence," *id.* The court held that to be "constitutionally material," the evidence "must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (citing *Ferguson*, 2 S.W.3d at 915, 918). "If the trial court determines that the State had a duty to preserve the evidence, the court must determine if the State failed in its duty." *Merriman*, 410 S.W.3d at 785 (citing *Ferguson*, 2 S.W.3d at 917). If the trial court concludes that the State lost or destroyed evidence that it had a duty to preserve, the trial court must then consider three factors to determine the appropriate remedy for the State's failure:

"(1) [t]he degree of negligence involved;

(2) [t]he significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

-17-

(3) [t]he sufficiency of the other evidence used at trial to support the conviction."

*Merriman*, 410 S.W.3d at 785 (quoting *Ferguson*, 2 S.W.3d at 917). "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Merriman*, 410 S.W.3d at 785-86.

We review the trial court's decision concerning the fundamental fairness of a trial conducted without the missing evidence under a de novo standard of review. *Id.* at 791 ("Because the application of *Ferguson* . . . presents a constitutional issue, we will apply a de novo standard of review to the trial court's decision concerning the fundamental fairness of the trial."). The trial court's choice of remedy, however, will not be overturned on appeal absent a showing that the trial court abused its discretion. *Id.* at 792 ("Thus, when the chosen remedy is consistent with the findings made by the trial court utilizing the *Ferguson* considerations, we will not overrule that choice on appeal.").

Here, the defendant's arguments that the State failed to preserve evidence are utterly devoid of reason. The State's failure to test the substances found in Mr. Cherry's possession after his death is a matter of investigation and not one of preservation of evidence. The State is under no duty "to investigate cases in any particular way," *State v. Brock*, 327 S.W.3d 645, 698 (Tenn. Crim. App. 2009) (quoting *State v. Tony Best*, No. E2007-00296-CCA-R3-CD, 2008 WL 4367529, at *13-14 (Tenn. Crim. App., Knoxville, Sept. 25, 2008)), or perform any particular test, *State v. Donald Terry Moore*, No. 01C01-9702-CR-00061, 1998 WL 209046, at *9 (Tenn. Crim. App., Nashville, Apr. 9, 1998) (citing *State v. Greg Lamont Turner*, No. 01C01-9503-CR-00078, 1995 WL 504801, at *3 (Tenn. Crim. App., Nashville, Aug. 25, 1995)); *see also State v. Terry W. Smith*, No. 01C01-9609-CC-00404, 1998 WL 918607, at *14 (Tenn. Crim. App., Nashville, Dec. 31, 1998) ("Due process does not require the police to conduct a particular type of investigation."). The defendant knew that the items had been collected into evidence, and he has presented no evidence that the State prevented him from testing the substances himself if he believed the evidence could benefit his defense.

As to the Taurus 380 firearm found inside the victims' vehicle on October 11, whether the State failed to find the gun during the inventory search or failed to secure the vehicle while it was parked in the police impound lot speaks to the credibility of the State's investigation, but again, the State is under no obligation to conduct its investigation in any particular way. *See Brock*, 327 S.W.3d at 698. This court has repeatedly held that the State's failure to collect evidence does "not result in a *Ferguson* violation." *State v. Franklin*, 585 S.W.3d 431, 461 (Tenn. Crim. App. 2019) (providing numerous examples

of cases in which this court found no failure to preserve certain evidence when officers did not collect that evidence). A defendant is free to challenge the State's investigation of the case during trial, and in this case, the defendant did just that; he repeatedly questioned witnesses about how the gun came to be in the victims' vehicle on October 11, after the inventory search and after the vehicle was secured in the police impound lot. *See Greg Lamont Turner*, 1995 WL 504801, at *3 (The State's investigatory failures "may be shown through the cross-examination of the appropriate [S]tate witness since it reflects upon the quality of the [S]tate's case").

Because the defendant failed to establish a *Brady* or *Ferguson* violation by the State, the trial court did not err by denying his motion to dismiss.

### III. Jury Instruction

Next, the defendant argues that the trial court erred by failing to instruct the jury as to the State's duty to preserve evidence. The State argues that such an instruction was not required by the evidence.

The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *see also* Tenn. R. Crim. P. 30. It is not necessary, however, to give a requested instruction if the general jury charge is complete. *State v. Zirkle*, 910 S.W.2d 874, 892 (Tenn. Crim. App. 1995). Furthermore, any request for special instructions must be made in writing, Tenn. R. Crim. P. 30(a), and failure to do so results in waiver of the issue, *State v. Haynes*, 720 S.W.2d 76, 85 (Tenn. Crim. App. 1986) (finding that a defendant's failure to submit a special request to the trial court constituted waiver of the issue on appeal).

Here, the only allusion to a request for a special jury instruction was the defendant's statement during the hearing on his motion to dismiss in which he asked the court to reserve for trial the issue of a jury instruction on the State's duty to preserve evidence. The defendant made no written request as required by the Rule or otherwise alerted the trial judge to the alleged omission, and consequently waived this issue. *See* Tenn. R. Crim. P. 30(a); *Haynes*, 720 S.W.2d at 76 (stating that "alleged omissions in the charge must be called to the trial judge's attention at trial or be regarded as waived" (citing *Rule v. Empire Gas Corp.*, 563 S.W.2d 551, 554 (Tenn. 1978))); *Lackey v. State*, 578 S.W.2d 101, 107-08 (Tenn. Crim. App. 1978) (holding that because the given jury charge was correct, "[i]f the appellant desired further instructions, he should have submitted a special request").

Waiver notwithstanding, as we explained above, the State did not fail to preserve evidence, and nothing adduced at trial gave rise to the need for an instruction on

the matter. "Because the defendant has failed to meet the prerequisites of *State v. Ferguson*, he has likewise failed to establish an entitlement to a jury instruction regarding the allegedly [unpreserved] evidence." *State v. Gilley*, 297 S.W.3d 739, 766 (Tenn. Crim. App. 2008) (internal citations omitted).

## *IV. Sentencing*

Finally, the defendant contends that the trial court erred by imposing a 20-year sentence because it failed to consider the defendant's allocution or the risk assessment of the presentence investigation report and failed to apply mitigating factors. The State argues that the court properly considered all evidence and did not abuse its discretion in rendering the sentence.

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise* 380 S.W.3d at 706 n. 41 (quoting T.C.A. § 40-35-210(e)).

Here, the record reveals that the trial court considered all relevant principles in imposing the sentence in this case. The trial court's giving little to no weight to the defendant's statement or the risk assessment of the presentence report does not support a finding that the trial court abused its discretion. *See Bise*, 380 S.W.3d at 707. Furthermore, the trial court's rejection of certain mitigating factors "does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. Because the record does not suggest that the trial court's decision to impose a 20-year sentence "wholly departed from" the Sentencing Act, this issue lacks merit.

## *Conclusion*

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-20-